# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
**HARRIETT A. AMES,**                              )
)
    **Plaintiff,**                             )
)
     **v.**                                   )        **Case No. 13-cv-001054 (APM)**
)
**KIRSTJEN NIELSEN,[1] et al.,**                   )
)
    **Defendants.**                            )
_____ )

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Plaintiff Harriett Ames is the former Chief of the Personnel Security Branch within the Federal Emergency Management Agency. As head of the Personnel Security Branch, Plaintiff's responsibilities included adjudicating security clearances for employees. Following events that began with agency management stripping her Branch of some of its adjudicatory responsibilities and ended with her reassignment to a different unit, Plaintiff filed suit against Defendants under Title VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the Constitution, alleging both retaliation and race, color, and gender discrimination.

This court previously dismissed Plaintiff's Equal Protection claim but deferred decision on whether *Department of Egan v. Navy*, 484 U.S. 518 (1988), and its progeny barred Plaintiff's Title VII claims as non-justiciable. At the motion to dismiss stage, the court reasoned, it was too early to determine whether adjudicating Plaintiff's claims would require an evaluation of the merits of her security clearance decisions.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of Homeland Security as the defendant in this case.

Now before the court is Defendant's Motion for Summary Judgment. After considering the record and the parties' briefs, the court concludes that Plaintiff has put forth sufficient evidence to survive summary judgment as to one of the three agency decisions underlying her claims—her reassignment. The court enters judgment in favor of Defendant with respect to the other two decisions at issue—stripping Plaintiff's Branch of security clearance adjudication responsibilities and temporarily transferring another agency employee into the Branch. The court therefore grants in part and denies in part Defendant's Motion for Summary Judgment.

## II.    BACKGROUND

The following facts are undisputed, except where noted. Plaintiff Harriett Ames, a dark-skinned African-American woman, is the former Chief of the Personnel Security Branch at the Federal Emergency Management Agency ("FEMA"), a sub-agency within the Department of Homeland Security ("DHS"). Def.'s Mot. for Summ. J., ECF No. 73 [hereinafter Def.'s Mot.], Def.'s Stmt. of Material Facts in Dispute, ECF No. 73-1 [hereinafter Def.'s Stmt.], ¶ 1; Pl.'s Statement of Material Facts, ECF No. 78 [hereinafter Pl.'s Stmt.], Exs., ECF No. 78-1 [hereinafter Pl.'s Exs.], at 81, ¶ 2.[2] The Personnel Security Branch is a component of the Program Protection Division, which is within FEMA's Office of the Chief Security Officer ("OCSO"). Def.'s Stmt. ¶ 2. As head of the Branch, Plaintiff was responsible for "adjudicating [security] clearances of employees and prospective employees" within FEMA. *See* Am. Compl., ECF No. 29 [hereinafter Am. Compl.], ¶ 19; Def.'s Mot., Exs. 1–5, ECF No. 73-4 [hereinafter Def.'s Exs. 1–5], at 4, ¶ 10; *cf.* Def.'s Mot., Def.'s Mem. of Points & Authorities, ECF No. 73-2 [hereinafter Def.'s Mem.], at 20–21; Pl.'s Opp'n to Mot. for Summ. J., ECF No. 76 [hereinafter Pl.'s Opp'n], at 20.

---

[2] Citations to Plaintiff's and Defendant's exhibits are to the page numbers electronically generated by CM/ECF.

In April 2011, the Personnel Security Branch adjudicated security clearances for Gary Walker and James Bland, two employees hired to work for FEMA OCSO as "Supervisory Fraud Manager[s]." *See* Def.'s Stmt. ¶¶ 9, 14; *cf.* Def.'s Exs. 1–5 at 13–18, 24. Plaintiff determined that Bland and Walker's positions would require "SS." Def.'s Stmt. ¶ 7; Def.'s Exs. 1–5 at 21. "SS" means "Special Sensitive," a term that designates a position as requiring access to "Top Secret/Sensitive Compartmented Information" ("TS/SCI"). *See* Def.'s Stmt. ¶¶ 13–14; *cf.* Pl.'s Stmt., Pl. Fact ¶ 7; Def.'s Reply in Support of Mot. for Summ. J., ECF No. 80 [hereinafter Def.'s Reply], Def.'s Resp. to Pl.'s Counter-Statement of Material Facts, ECF No. 80-1 [hereinafter Def.'s Reply Stmt.], at 4–5. "Top secret" clearance is the highest level of security clearance. Def.'s Stmt. ¶ 15. Plaintiff approved a "secret" interim clearance status for Walker in April 2011 and requested an "EOD" (entry of duty) for him before he completed his "e-QIP," a web-based automated system designed to facilitate the processing of investigative forms used when conducting background investigations.[3] Def.'s Exs. 1–5 at 21, 24; Def.'s Stmt. ¶ 8 n.2. Plaintiff also approved a "secret" interim clearance status for Bland in May 2011 and requested an EOD for him before a full background investigation was completed. Def.'s Stmt. ¶¶ 13, 16–17; Pl.'s Exs. at 90, ¶ 79. Neither Plaintiff nor the Personnel Security Branch granted "interim *top secret* clearance" to any FEMA employees or hires, including Walker and Bland. *See* Def.'s Stmt. ¶ 4.

Some months later, Bland's and Walker's security clearances would come under scrutiny. In July 2011, the DHS Office of Inspector General ("OIG") conducted an investigation into FEMA OCSO's hiring and security clearance adjudication practices. Def.'s Stmt. ¶ 21; Def.'s Mot., Exs.

---

[3] Plaintiff admits that Defendant's evidence shows that she approved her staff's recommendation that "FEMA comply with reciprocity requirements and recognize a secret clearance for Mr. Walker." Pl.'s Exs. at 91, ¶ 84; *see* Def.'s Exs. 1–5 at 21 (e-mail from Plaintiff regarding EOD for Walker and Bland). She claims, however, that the determination of whether Mr. Walker could enter on duty was made by another office, rather than her Branch, due to an error by the hiring office, and that her Branch did not communicate to the personnel office that Mr. Walker could enter on duty. *Id.* at ¶¶ 85–86. *But see* Def.'s Exs. 1–5 at 21 ("[W]e can issue an EOD approval for Gary [Walker] and he can complete E-Qip while on board. [Bland] on the other hand will need to complete E-Qip before we can EOD.").

9–14, ECF No. 73-5 [hereinafter Def.'s Exs. 9–14], at 16, ¶ 3; *see id.* at 22–23, ¶ 13; *cf.* Pl.'s Stmt., Pl. Fact ¶¶ 40–42. During this timeframe, then-FEMA Associate Administrator David Garratt learned about the security clearance adjudications of Walker and Bland, both of whom were granted favorable adjudications despite past transgressions. Def.'s Stmt. ¶ 22; *see also* Def.'s Exs. 9–14 at 26–27, ¶¶ 3, 5. On July 22, 2011, Garratt suspended FEMA OCSO from adjudicating security clearances for its own hires and employees. Def.'s Stmt. ¶ 26; Def.'s Exs. 9–14 at 28; *see also* Pl.'s Opp'n at 20. Because Garratt did not see any evidence of potentially compromised adjudication practices for FEMA hires outside of OCSO, he still permitted the Branch to adjudicate security clearances for non-OCSO personnel. Def.'s Stmt. ¶¶ 25, 28.

In light of the issues surrounding the Personnel Security Branch, including the then-ongoing OIG investigation, the DHS Chief Security Officer at the time, Gregory Marshall, ordered that a Security Compliance Review ("SCR") be conducted on the Personnel Security Branch and other FEMA security branches. *Id.* ¶¶ 30–31. The SCR was conducted in August 2011. *Id.* ¶ 33. It resulted in 16 findings critical of the Personnel Security Program, whose day-to-day operations were run by Plaintiff, and an overall rating of "unsatisfactory" for the Program. *Id.* ¶¶ 37–38; *see also* Def.'s Exs. 9–14 at 3–14. During that same month, Plaintiff told Jose Cantu, her first-line supervisor, that there was a backlog of 3,500 suitability/public-trust investigations that were awaiting adjudication but not reported "on the metrics." Def.'s Stmt. ¶ 56. Several weeks later, on September 8, 2011, Plaintiff sent an e-mail to Cantu and Jose Salazar, her second-line supervisor, stating that she was overwhelmed with deadlines and was experiencing headaches and chest pains, making it increasingly difficult to work under such conditions. *Id.* ¶¶ 57–58.

Later in September 2011, agency management detailed Alfreda Hester, an African-American woman and employee from DHS headquarters, to serve as a deputy to Cantu. *Id.* ¶¶ 64–

64A, 66. Her position title was "Deputy Division Director for Program Protection Division." *Id.*

¶ 66. Hester took over Plaintiff's duties adjudicating security clearances, representing the Branch

in personnel security meetings and senior staff meetings, approving leave requests, and scheduling

training. Pl.'s Stmt., Pl. Fact ¶ 62.[4] Plaintiff, however, retained her title as Chief of the Personnel

Branch and continued to supervise security specialists in her Branch. Def.'s Stmt. ¶ 66; *see also*

Notice of Correction Related to Gov't Exs., ECF No. 81 [hereinafter Notice of Correction], at 3.

In November 2011, agency management formally removed Plaintiff as Chief of the

Personnel Security Branch and reassigned her to a different position within FEMA OCSO. Def.'s

Stmt. ¶ 88; Def.'s Mot., Exs. 24–30, ECF No. 73-7 [hereinafter Def.'s Exs. 24–30], at 26; *see* Pl.'s

Exs. at 91–92, ¶ 89. Plaintiff's new job title was Chief of the Training Section. Def.'s Stmt. ¶¶ 93,

100, 102; Def.'s Exs. 24–30 at 26. A white female was named interim Chief of the Personnel

Security Branch. *See* Am. Compl. ¶ 42; Am. Answer, ECF No. 51 [hereinafter Am. Answer],

¶ 42; Def.'s Exs. 24–30 at 23–24.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court must grant summary judgment "if

the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if a reasonable

fact-finder could find for the nonmoving party, and a fact is "material" only if it is capable of

affecting the outcome of litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and

upon motion, against a party who fails to make a showing sufficient to establish the existence of

---

[4] In its reply to this statement of fact, Defendant simply states that Plaintiff testified that "she retained her duties as Branch Chief of the Personnel Security Branch with supervisory duties." Def.'s Reply Stmt. at 13. Thus, Defendant does not appear to dispute that some of Plaintiff's duties were transferred to Hester; rather, Defendant presumably seeks to clarify that Plaintiff retained her supervisory duties as Chief of the Branch after the September detail.

an element essential to that party's case . . . on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying those portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." *Id.* at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted). The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, and it is from this list that one would normally expect the nonmoving party to make the showing to which [the Court has] referred." *Celotex Corp.*, 477 U.S. at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. But "[t]o defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex Corp.*, 477 U.S. at 324). In other words, if the non-movant's evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). Summary judgment, then, is appropriate when the nonmoving party fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

## IV. DISCUSSION

Title VII prohibits federal agencies from discriminating against their employees based on race, color, or sex. *McGrath v. Clinton*, 666 F.3d 1377, 1379 (D.C. Cir. 2012); *see* 42 U.S.C.

§ 2000e-16(a). Title VII also makes it unlawful to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice" by the statute. *McGrath*, 666 F.3d at 1379–80 (quoting 42 U.S.C. § 2000e-3(a)). Where, as here, a plaintiff proffers only indirect evidence of unlawful discrimination or retaliation to support her Title VII claims, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Weber v. Battista*, 494 F.3d 179, 182 (D.C. Cir. 2007).

Under this framework, a plaintiff must first establish her prima facie case. *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015). To state a prima facie case of discrimination, a plaintiff must show that "(1) [s]he is a member of a protected class, (2) [s]he suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination (that is, an inference that [her] employer took the action because of [her] membership in the protected class)." *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (internal quotation marks omitted). To state a prima facie case of retaliation, a plaintiff must show that "[1] she engaged in activity protected by Title VII, [2] the employer took adverse action against her, and [3] the employer took that action because of [her] protected conduct." *Walker*, 798 F.3d at 1091–92. Once the plaintiff has established her prima facie case, the burden shifts to the employer, who must identify some "legitimate, non-discriminatory or non-retaliatory reason" for the employment action, *see id.* at 1092, which the plaintiff can rebut by showing that the employer's stated reason is "merely pretext," *Brown*, 774 F.3d at 1023.

This framework is modified at the summary judgment stage. "[O]nce the employer has claimed a nondiscriminatory reason for its actions, th[e] burden-shifting framework disappears," *Nurriddin v. Bolden*, 818 F.3d 751, 758 (D.C. Cir. 2016), and "the sole remaining issue [i]s discrimination *vel non*," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)

(internal quotation marks omitted); *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009) (applying same rule in retaliation context). The "central question" becomes "whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted nondiscriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker*, 798 F.3d at 1092 (internal quotation marks omitted).

Here, Plaintiff's Title VII claims are premised on three agency actions that she alleges ultimately led to her removal as Chief of the Personnel Security Branch and reassignment to the Training Section. Those actions are: (1) the July decision to suspend Plaintiff's Branch from adjudicating security clearances for FEMA OCSO hires and employees; (2) the September decision to detail Ms. Hester to the Personnel Security Branch; and (3) the November reassignment decision. *See* Pl.'s Opp'n at 11–15, 20, 24. With respect to each of these actions, Plaintiff claims race, color, and gender discrimination, as well as retaliation. *See generally* Am. Compl. ¶¶ 4, 12, 33, 38, 55.

Defendant's response to each of these actions is threefold. First, Defendant argues that Plaintiff's Title VII claims are non-justiciable under *Department of Egan v. Navy*, 484 U.S. 518 (1988), because they challenge a national security decision made by the agency. Def.'s Mem. at 5. Second, Defendant argues that even if Plaintiff's claims are not barred by *Egan*, Plaintiff cannot establish a prima facie case of discrimination or retaliation under Title VII because she did not suffer a cognizable adverse employment action. *Id.* at 18, 20. Finally, Defendant argues that it had legitimate, non-discriminatory and non-retaliatory reasons for all three of its actions, and such reasons were not pretextual. *Id.* at 24. The court will address each of these arguments in turn, in the order in which the agency actions occurred.

### A.  July Suspension of Adjudicatory Authority Within Plaintiff's Branch

The court turns first to the July 2011 decision by the agency to suspend the Personnel Security Branch from adjudicating security clearances for FEMA OCSO hires and employees. For the reasons stated below, the court concludes that Plaintiff loses under all three of Defendant's arguments.

### 1.  *Justiciability of Plaintiff's Title VII Claims Under* Egan

The parties agree that *Egan* and its progeny preclude judicial review of Title VII claims that require courts to evaluate the merits of security clearance determinations, but disagree as to whether *Egan* applies in this case. *See Ames v. Johnson*, 121 F. Supp. 3d 126, 127 (D.D.C. 2015). In *Egan*, the Supreme Court held that the Merit Systems Protection Board lacked the authority to review a federal employee's complaint about the denial of a security clearance. 484 U.S. at 527–29. The Court stated that, "[f]or 'reasons . . . too obvious to call for enlarged discussion,' the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it." *Id.* at 529 (second alteration in original) (citation omitted). The Court explained that "it is not reasonably possible for an outside nonexpert body to review the substance of such a judgment and to decide whether the agency should have been able to make the necessary affirmative prediction with confidence." *Id.* Thus, the ordinary presumption favoring reviewability of administrative actions "runs aground when it encounters concerns of national security." *Id.* at 526–27.

D.C. Circuit precedent has sharpened *Egan*'s application in this jurisdiction. In *Ryan v. Reno*, the plaintiffs were denied federal jobs because they were not granted the required security clearances, a decision that the plaintiffs asserted was discriminatory. 168 F.3d 520, 522–23 (D.C. Cir. 1999). Stating that it was "necessary" to apply the *McDonnell Douglas* burden-shifting

analysis to determine the merits of the plaintiffs' claims, the court concluded that it could not "clear the second step of *McDonnell Douglas* without running smack up against *Egan*." *Id.* at 523–24. Specifically, because the federal agency had proffered the plaintiffs' inability to obtain security clearances as its non-discriminatory reason for the non-hiring, the court ruled that plaintiffs "could not challenge the proffered reason's authenticity without also challenging its validity." *Id.* at 524. Challenging the reason's validity, in turn, would have required the plaintiffs to ask the court to review the merits of the security clearance decisions—a result forbidden by *Egan*. *See id.* Accordingly, the court in *Ryan* found the plaintiffs' claims to be non-justiciable under *Egan*. *Id.* at 524–25. Cases after *Ryan* similarly have held that *Egan* bars Title VII claims where "an adverse employment action [is] based on denial or revocation of a security clearance," *Ryan*, 168 F.3d at 524; *see Foote v. Moniz*, 751 F.3d 656, 658–59 (D.C. Cir. 2014) (holding Title VII plaintiff could not challenge the Department of Energy's decision to deny him certification under its Human Reliability Program, which evaluated the suitability of employment applicants who would have access to nuclear devices, materials, or facilities); *Bennett v. Chertoff*, 425 F.3d 999, 1003 (D.C. Cir. 2005) ("Bennett could not challenge the authenticity of TSA's proffered reason [for termination]—her inability to maintain a security clearance—without also challenging the validity of the reason, which is what *Ryan* prohibits.").

The D.C. Circuit also has limited *Egan*'s reach. In *Rattigan v. Holder*, the court held that *Egan* does not "insulate[] from Title VII *all* decisions that might bear upon an employee's eligibility to access classified information." 689 F.3d 764, 767 (D.C. Cir. 2012). Instead, because "*Egan* emphasized that the decision to grant or deny security clearance requires a '[p]redictive judgment' that 'must be made by those with the necessary expertise in protecting classified information,'" *Egan* does not preclude review of decisions by employees lacking expertise in

security matters who merely report security concerns. *Id.* at 767–68 (alteration in original) (quoting *Egan*, 484 U.S. at 529). In particular, the court concluded that *Egan* does not apply to discrimination claims premised on the assertion that that "agency employees acted with a retaliatory or discriminatory motive in reporting or referring information that they knew to be false." *Id.* at 771.

With these cases in mind, the court must determine whether Plaintiff's Title VII claims— particularly, the evidence that she relies upon to establish pretext—would require the court to second guess the agency's "predictive judgment" regarding its security clearance determinations. Defendant contends that its reason for suspending Plaintiff's Branch from adjudicating security clearances for FEMA OCSO hires or employees was grounded in "national security concerns" about FEMA OCSO's adjudicatory process. *See, e.g.*, Def.'s Reply at 3. As support for its position, Defendant relies on the sworn declaration of the agency official who made the decision, David Garratt. *See* Def.'s Mem. at 13. Garratt attests that he issued the directive to halt certain security adjudications after learning of OIG's investigation into the security clearances of two recently hired FEMA OCSO employees (Walker and Bland). *See* Def.'s Exs. 9–14 at 26–27, ¶¶ 3, 5; *cf. id.* at 22–23, ¶ 13. Garratt further declares that he limited the scope of the prohibition only to adjudication of clearances of OCSO employees based on his immediate concern that the adjudication process within FEMA OCSO was or had been compromised. *Id.* at 27, ¶ 5.

Plaintiff attempts to create factual disputes with respect to the agency's reasoning behind the July decision by arguing that "Garratt had no reason for his alleged [security] concern, and therefore, it did not exist." Pl.'s Stmt., Pl. Fact ¶ 43C; *see* Pl.'s Opp'n at 22. Plaintiff points to the absence of any contemporaneous records corroborating Garratt's story or the OIG investigation, and the lack of evidence that other agency officials were aware of the reasons

Defendant now claims motivated Garratt's decision. *See* Pl.'s Opp'n at 22; Pl.'s Stmt., Pl. Fact ¶¶ 45–51.[5] In short, Plaintiff disputes the national security rationale advanced by Defendant.

The court agrees with Defendant that *Egan* bars review of Plaintiff's Title VII claims that are premised on the July suspension. Garratt's concerns about the FEMA OCSO adjudicatory process are predicated on "the same sort of 'predictive judgment' that *Egan* tells us 'must be made by those with the necessary expertise in protecting classified information,' without interference from the courts." *Ryan*, 168 F.3d at 524 (quoting *Egan*, 484 U.S. at 529). To succeed on the merits of her Title VII claims, Plaintiff must prove that the reason given for the July restriction is pretext for discrimination. Doing so, however, necessarily will require the trier of fact to question the veracity of the agency's security concerns arising out of the Bland and Walker security clearances. *See Ryan*, 168 F.3d at 524 (holding plaintiffs could not challenge the authenticity of the employer's reason without also challenging its validity). In that vein, the "predictive judgment" of trained security personnel—be it Plaintiff herself or those within the agency, such as Garratt, who found the adjudications to pose a threat to national security—will be directly called into question. *Egan* forbids such second-guessing. *See id.*

Plaintiff tries to avoid the application of *Egan* by characterizing the agency's reason for the suspension as one grounded in failure to follow agency policy regarding interim security

---

[5] Although the court considers Plaintiff's argument, its factual premise is highly dubious. First, Plaintiff cannot seriously dispute the existence of the OIG investigation. *See Ames v. U.S. Dep't of Homeland Sec.*, 153 F. Supp. 3d 342, 344 (D.D.C. 2016) (noting that in August 2011, a senior special agent of the DHS OIG interviewed Plaintiff herself as part of an active investigation of Burt Thomas and the Bland/Walker adjudications). Second, Garratt's reasons for the July decision are not "new," as Plaintiff claims. *Compare* Pl.'s Exs. at 20–21, 27–28 (interrogatory responses), *with* Def.'s Exs. 9–14 at 26–27 (Garratt declaration). And while there are no contemporaneous records of Garratt's reasoning, there also are no records that contradict his story, nor any indication that he would have normally documented his reasoning. Finally, Plaintiff inaccurately characterizes the present record by stating that Salazar and Oliver (two officials who did not make the decision) were unaware of Garratt's reasoning. *See* Pl.'s Opp'n at 22, 25–26. In support of this contention, Plaintiff cites to Oliver's and Salazar's certifications of Defendant's interrogatory responses. *See id.* While these responses omit certain details mentioned in Garratt's declaration, such as alleged involvement by then-FEMA Chief Security Officer Burt Thomas, they expressly cite the improper grant of security clearances by Plaintiff's Branch as the reason for the decision. *See* Pl.'s Exs. at 20–21, 27–28.

clearances. *See generally* Pl.'s Opp'n at 28–30. In particular, Plaintiff claims that the agency relied upon a new interpretation of a federal regulation relating to interim security clearances that Plaintiff asserts is inconsistent with long-standing agency policy and practice, which is what she adhered to in approving the two relevant adjudications here. *See id.*; Pl.'s Stmt., Pl. Fact ¶¶ 9–12, 16–28, *cf.* Pl.'s Exs. at 90–91, ¶¶ 79–86. Thus, according to Plaintiff, the court need not consider the correctness of the agency's security rationale because "[r]elying on [an] employee's compliance with [an undisclosed, newly interpreted] agency policy is pretext regardless of the wisdom . . . of that policy." Pl.'s Opp'n at 28.

To be sure, this court previously held that, if Plaintiff's adjudications were deemed to be "questionable" due to a failure to follow agency policy, as opposed to a disagreement on the merits of the underlying clearance determination, *Egan* might not necessarily bar review. *See Ames*, 121 F. Supp. 3d at 132–33 (citing *Thomas v. Johnson*, 4 F. Supp. 3d 157 (D.D.C. 2014)). But that is not the case here. First and foremost, the action taken against the Personnel Security Branch was not based strictly on Plaintiff's failure to follow agency policy forbidding interim clearances. Rather, the record evidence shows that the broader concern was that the security clearance adjudicatory process within Plaintiff's Branch had been compromised—a concern that arose when Garratt learned of the then-ongoing OIG investigation into the questionable adjudications of Walker and Bland. Def.'s Mem. at 8, 13, 27; *see* Def.'s Exs. 9–14 at 26–27. Under *Egan*, a trier of fact cannot retrospectively look behind an agency's security concern to determine whether it is a pretext for discrimination.

Moreover, *Ryan* forecloses Plaintiff's "attempt to circumvent *Egan* by characterizing the challenged employment actions as procedural, divorced from any substantive security determination." 168 F.3d at 524. In *Ryan*, the plaintiffs focused on the agency's adherence to the

procedures used to make the clearance decisions, as opposed to the denials themselves. But because the agency denied the waivers based on its conclusion that "no clearances should be granted without more extensive investigations than were possible here," the court reasoned that "the waiver denials were tantamount to clearance denials and were based on the same sort of predictive judgment" contemplated by *Egan*. *Id.* (internal quotation marks omitted). By extension here, Defendant's interpretation and reliance on the applicable federal regulation reflects its predictive judgment about the dangers of granting interim clearances without a full background investigation. *Egan* cannot be avoided by claiming, as Plaintiff does, that the agency's change in policy interpretation itself demonstrates pretext, because such an inquiry necessarily would require the trier of fact to scrutinize how the parties' differing interpretations of interim security clearance policies would apply to the Bland and Walker cases. Such predictive judgments are off limits under *Egan*.

Therefore, under *Egan*, Plaintiff's Title VII claims with respect to the July decision are non-justiciable.

### 2. *The Merits of Plaintiff's Title VII Claims Under* McDonnell Douglas

Even if Plaintiff's Title VII claims premised on the July suspension could be adjudicated, those claims fail on the merits. Although most discrimination cases contain no dispute that the employee has suffered an adverse employment action, *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008), that is not the case here. Defendant contends that the July suspension does not constitute an adverse employment action. Def.'s Mem. at 20–21.

"[N]ot everything that makes an employee unhappy is an actionable adverse action." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (internal quotation marks omitted). In the discrimination context, an "adverse employment action" is "a significant change in

employment status." *Id.* (internal quotation mark omitted). To suffer an adverse action, the employee must "experience[] *materially adverse* consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (emphasis added). Although "hiring, firing, failing to promote, [and] reassignment with significantly different responsibilities *categorically* are adverse employment actions," employment actions that do not obviously cause a significant change in employment status—such as a decision causing a significant change in benefits—require the plaintiff to "go the further step" of demonstrating how the decision caused objectively tangible harm. *Douglas*, 559 F.3d at 553, 556 (emphasis added) (internal quotation marks omitted). In the latter case, the court must consider "whether the alleged harm is unduly speculative." *Id.* at 553. "Purely subjective injuries, such as dissatisfaction with a reassignment, or public humiliation or loss of reputation, are not adverse actions." *Forkkio*, 306 F.3d at 1130–31 (citations omitted); *see, e.g.*, *Douglas*, 559 F.3d at 552–53 (explaining that performance evaluations are ordinarily too speculative to be actionable under Title VII). Indeed, in most cases, a tangible employment action will "inflict[] *direct* economic harm." *Douglas*, 559 F.3d at 552 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 762 (1998)).

The question here is whether a reasonable juror could find that the limited adjudicatory suspension caused Plaintiff objectively tangible harm. A reasonable juror could not. The "adverse" action in question was directed not at Plaintiff alone, but at the *entire Branch*. Plaintiff cites no case for the proposition that an action taken against a group of people can be bootstrapped into an adverse action against an individual, and the court is aware of none. Moreover, the July restriction of adjudicatory authority is not "categorically" adverse, thus requiring Plaintiff to show

objectively tangible harm. But Plaintiff fails to present any evidence of such harm. She does not, for instance, claim that the suspension affected her pay or grade. While Plaintiff's declaration asserts that the suspension "made it appear that [she] was somehow involved in unspecified wrongdoing," Pl.'s Exs. at 84, ¶ 30, such alleged harm is little more than a reputational injury, which is not actionable, *see Stewart v. Ashcroft*, 352 F.3d 422 (D.C. Cir. 2003) ("[A] bruised ego will not suffice to make an employment action adverse." (internal quotation marks omitted)). Accordingly, because the July suspension does not qualify as an adverse action, Plaintiff's disparate treatment claims fail.[6]

The same result obtains as to Plaintiff's retaliation claim, but for an even simpler reason: It is undisputed that the July 2011 suspension took place *before* Plaintiff made initial contact with an Equal Employment Opportunity counselor. *See* Am. Compl., Final Agency Decision, ECF No. 38-1 [hereinafter FAD], at 1; *see also* Def.'s Mem. at 20 n.7. To state the obvious, an employee cannot claim retaliation for protected activity that has yet to occur.

Accordingly, to the extent Plaintiff's discrimination and retaliation claims are premised on the July suspension, Defendant's Motion for Summary Judgment is granted.

## B. September Detail of Ms. Hester

The court turns next to the September 2011 decision to detail Ms. Hester to the Personnel Security Branch. According to Plaintiff, the detail resulted in Hester effectively replacing Plaintiff as Chief of the Branch. For the reasons stated below, while the court finds that *Egan* does not

---

[6] Although the court need not reach the issue, the court also finds that Plaintiff has failed to point to any admissible evidence that would create a genuine dispute of fact as to pretext. The only rebuttal Plaintiff offers to Defendant's non-discriminatory reason is that no contemporaneous records corroborate Garratt's explanation for suspending the Branch's security clearance function and that others, namely Oliver and Salazar, were not aware of that explanation. *See* Pl.'s Opp'n at 22. But the absence of a contemporaneous record does not create a conflict with Garratt's stated reasons, and Plaintiff's contention about the absence of knowledge by others is based entirely on her own speculation, not direct testimony from those persons. *See id.* (citing Pl.'s Stmt., Pl. Fact ¶¶ 48–49, which in turn cite Pl.'s Exs. at 27–28 (Defendant's supplemental interrogatory answer that makes no reference to Oliver's or Salazar's knowledge)). Plaintiff's Title VII claim therefore fails on the ultimate question of "discrimination *vel non*."

preclude review of Plaintiff's claims premised on the September detail, these claims fail on the merits because no reasonable jury could find that the reasons proffered by the agency were pretext for discrimination or retaliation.

1. *Justiciability of Plaintiff's Title VII Claims Under* Egan

The court begins its *Egan* inquiry by identifying the reasons proffered by the agency for the September 2011 detail of Hester. Those reasons have varied, albeit slightly. In its Motion, Defendant states that Hester was detailed "to address two equally important concerns that arose at th[e] time," which "formed the bases for the detail": "the shortcomings identified in the SCR" and "the thousands of backlogged cases awaiting clearance adjudication." Def.'s Mem. at 28; *see also* Def.'s Stmt. ¶ 60 (stating that Clifford Oliver, the then-Acting Chief of FEMA OCSO, "decided to reach out to DHS OCSO for help" "[d]ue to the workload and stress experienced by the Personnel Security Branch and given the results of the SCR"). Those reasons are corroborated by contemporaneous e-mails among Plaintiff's superiors. *See* Def.'s Mot., Exs. 15–23, ECF No. 73-6 [hereinafter Def.'s Exs. 15–23], at 2. By contrast, Defendant's supplemental interrogatory response offers a narrower reason: "[T]he decision was made because of concerns that Ms. Ames and the Personnel Security Branch had improperly granted security clearances." Pl.'s Exs. at 22. Nowhere do Defendant's interrogatory responses identify a backlog of security clearances as a reason for the detail. *See generally id.* at 11–13, 22–23, 29–30, 43–44, 53–55.

Defendant contends that there is no inconsistency among these rationales for Hester's detail because, among its 16 findings, the SCR found that the Personnel Security Branch had improperly granted interim security clearances and that the processing of clearances was not in accordance with federal regulations. *See* Def.'s Exs. 9–14 at 10. In light of that finding, Defendant argues,

the predictive security risk assessment at the heart of *Egan* is necessarily implicated, thereby barring review of the decision to transfer Hester into Plaintiff's Branch.

Defendant's reliance on *Egan* cannot, however, be sustained on this record at the summary judgment stage. What role, if any, Plaintiff's erroneous security clearance determinations played in the decision to temporarily assign Hester to the Branch is unclear. True, the SCR makes reference to erroneous or improper processing of security clearances, but it does so only in two of 16 different administrative and management deficiencies identified within the Personnel Security Program. *See* Def.'s Exs. 9–14 at 3–14; *cf.* Def.'s Stmt. ¶¶ 37–55. Indeed, the majority of the SCR addresses problems with Branch management that have nothing to do with security risk assessments. *See, e.g.*, Def.'s Exs. 9–14 at 8 (negative comments by interviewed personnel regarding management and work environment); *id.* at 12 (management is inaccessible and can be abrupt, demeaning, and abusive at times); *id.* (morale at extremely low level); *id.* at 11 (unrealistic metric/statistical units of production for adjudicative staff); *id.* (poor communication due to inconsistencies in management's delivery of policy and guidance to staff); *id.* at 9, 13 (inexperience of adjudication staff); *id.* at 12 (staff would benefit from training but requests are denied or they receive no response from management); *id.* (staff not always utilized to its strengths); *id.* at 13 (written policy frequently old, incomplete, and inaccurate); *accord* Def.'s Stmt. ¶¶ 40, 42, 46–52, 54. Other problems concern the Branch's failure to adjudicate clearances in a timely manner. *See* Def.'s Exs. 9–14 at 9 (FEMA not meeting adjudication timelines mandated by federal law); *id.* at 10 (backlog of 4,200 cases awaiting adjudication); *accord* Def.'s Stmt. ¶¶ 41, 43.

In view of the breadth of the SCR's criticisms, the court cannot find at this stage, as a matter of law, that *Egan* precludes review of the decision to detail Hester to the Personnel Security

Branch. If in fact the SCR prompted Hester's detail, it does not necessarily follow that *Egan* precludes review of that decision, as many of the report's critiques have nothing to do with predictive judgments about security risk assessments. Therefore, the court finds that there remains a material dispute of fact as to whether *Egan* precludes review of the decision to assign Hester to the Personnel Security Branch.

## 2. *Adverse Employment Action*

As with the July suspension, Defendant also claims that Plaintiff did not suffer adverse employment action as a result of the September detail. Def.'s Mem. at 3, 21–22. The September detail at issue here does not involve hiring, firing, or failure to promote. After all, Plaintiff at least nominally retained her title of Chief of the Personnel Security Branch, as well as her status as a GS-14 level employee. *See* Notice of Correction at 3. Plaintiff further admits that her salary even increased during the time of the detail. *Id.* Thus, Plaintiff relies instead on the change in her duties after Hester's detail, which she alleges resulted in her effective displacement as Chief of the Branch. *See* Pl.'s Opp'n at 21.

"[W]ithdrawing an employee's supervisory duties" or reassigning an employee with "significantly different responsibilities" can constitute an adverse employment action, but the inquiry is necessarily fact-bound. *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007) (alteration in original) (internal quotation marks omitted). For example, in *Forkkio*, the plaintiff brought a Title VII claim premised on a significant change in job responsibilities after losing his job title as "Section Chief" during an agency reorganization. 306 F.3d at 1129, 1131. The D.C. Circuit held this change did not constitute material adversity because the plaintiff's substantive responsibilities were not reduced: "he was given additional functions to perform; he continued to supervise his former staff members; and he was given additional staff." *Id.* at 1131. Although the

plaintiff was forced to report to a colleague who was previously his peer, and was unable to attend weekly meetings with the other section chiefs or receive certain communications sent to management officials during the several months before his reappointment, the court found such facts were "not sufficiently significant to amount to materially adverse consequences." *Id.* (internal quotation marks omitted).

By contrast, an employment action that results in "a complete inability to perform all of [one's] job responsibilities" is considered adverse under Title VII. *See Niskey v. Kelly*, 859 F.3d 1, 8 (D.C. Cir. 2017). In *Niskey*, the district court held that the Department of Defense's decision to suspend the security clearance of an employee working as an information technology specialist was not adverse. *See id.* The Circuit disagreed, holding that "a reasonable trier of fact could find that the suspension of Niskey's security clearance, even though initially with pay, was materially adverse." *Id.* at 8–9. The court reasoned that "because the nature of Niskey's job was such that, without a security clearance, he could not perform any aspects of his job," "[a] reasonable trier of fact could conclude that a total loss of ability to function as an employee amounted to objectively tangible harm." *Id.* at 8 (internal quotation marks omitted). "[S]uch employment paralysis seems to be far more than the type of 'purely subjective harm[]' for which suit might not stand." *Id.* (alteration in original) (quoting *Forkkio*, 306 F.3d at 1131). Notably, the court distinguished its earlier decision in *Forkkio*, where the plaintiff "lost little more than his job title" and "the substance of his work, pay, and benefits did not materially change for the worse." *Id.* at 9. Niskey, on the other hand, "lost almost everything." *Id.*

The September detail in this case falls somewhere in between *Forkkio* and *Niskey*. Unlike in *Niskey*, Plaintiff did not suffer a complete loss of job responsibilities because she retained certain supervisory responsibilities. *See* Def.'s Stmt. ¶ 66; *see also* Notice of Correction at 3. Yet,

Plaintiff does not merely allege that she was unable to attend certain meetings or receive certain communications, like the plaintiff in *Forkkio*. Instead, she claims that substantive duties relating to the adjudication of security clearances—duties that were presumably central to her job as Chief of the Personnel Security Branch—were transferred to Hester. *See* Pl.'s Stmt., Pl. Fact ¶ 62. And, importantly, Plaintiff's claim that she was de facto removed from her leadership position does not rest on her testimony alone. The record contains an e-mail dated September 2, 2011, from Oliver, then-Acting Chief of FEMA OCSO, which states that the person designated to the Branch—who ended up being Hester—"will have *complete authority* of the Personnel Security Program. They will first focus on training the personnel security staff and then will address other shortcomings identified in the SCR." *See* Def.'s Exs. 15–23 at 2 (emphasis added). Although Defendant claims that Plaintiff did not report to Hester and Hester did not assume her duties as Chief of the Branch, *see* Def.'s Mem. at 21 (citing Def.'s Exs. 15–23 at 13, ¶ 5), these facts are disputed and bear directly on the element of adversity. Thus, viewing the evidence in the light most favorable to Plaintiff, the court finds a reasonable jury could find that the September detail was materially adverse for purposes of Plaintiff's discrimination claim. *See Czekalski*, 475 F.3d at 365 ("Whether a particular reassignment of duties constitutes an adverse action for purposes of Title VII is generally a jury question.").

The same result follows for Plaintiff's retaliation claim. Retaliation "encompass[es] a broader sweep of adverse actions than those in a pure discrimination claim." *Baloch*, 550 F.3d at 1198 n.4. In the retaliation context, a "materially adverse" action is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (internal quotation marks omitted). As already discussed, there is a factual dispute with regard to the consequences of the

September detail. The court therefore has little trouble concluding that the prospect of a de facto replacement might dissuade a reasonable worker from making a charge of discrimination. Accordingly, the court finds Plaintiff has submitted sufficient evidence to create a triable issue with respect to adversity in the retaliation context.

### 3. *Pretext*

Having concluded that the evidence is sufficient to show that Plaintiff suffered adverse employment action, the court must now turn to the circumstantial evidence of both discriminatory and retaliatory intent. As stated above, Defendant has proffered a legitimate, non-discriminatory and non-retaliatory reason for the September detail—addressing problems in the SCR and the backlog of adjudications in Plaintiff's Branch. Accordingly, the *McDonnell Douglas* burden-shifting framework is no longer relevant, and the central question is whether a reasonable jury could find that the legitimate reason proffered by Defendant is not the actual reason and that Defendant intentionally discriminated or retaliated against her on the basis of race, color, or gender. In other words, the court must determine whether a jury could infer discrimination and retaliation from all of the evidence presented by both parties. *See Nurriddin*, 818 F.3d at 758–59; *Jones*, 557 F.3d at 678–79; *see also Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (holding that courts must consider "the total circumstances of the case" and ask whether the jury could infer discrimination or retaliation "from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." (alteration in original) (internal quotation mark omitted)).

In rebutting the explanation proffered by the defendant, the plaintiff may show that the reasons offered were not the defendant's true reasons, but were a pretext for retaliation or discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Durant v. District of Columbia*, 875 F.3d 685, 697 (D.C. Cir. 2017). To do so, the plaintiff may point to, among other things, the defendant's "better treatment of similarly situated employees outside the plaintiff's protected group, *its inconsistent or dishonest explanations*, its deviation from established procedures or criteria," its "pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (emphasis added) (internal quotation mark omitted). "[T]hough evidence of pretext is not *per se* sufficient to permit an inference of discrimination [or retaliation], it [u]sually . . . will be enough to get a plaintiff's claim to a jury." *Jones*, 557 F.3d at 679 (second and third alterations in original) (internal quotation marks and citations omitted).

Plaintiff points primarily to Defendant's alleged shifting explanation for transferring Hester into the Program as evidence of pretext. *Cf.* Pl.'s Opp'n at 7–10, 23–26. Recall, Defendant asserts in its Motion that the reason for detailing Hester was to assist with the backlog of security clearances and to address the weaknesses identified in the SCR, Def.'s Mem. at 28, but in its interrogatory responses it identified a narrower reason for the detail—the erroneous security clearances of Bland and Walker—and made no mention of the backlog, *see* Pl.'s Exs. at 22. To be sure, "shifting and inconsistent justifications are probative of pretext." *Geleta v. Gray*, 645 F.3d 408, 413 (D.C. Cir. 2011) (internal quotation marks omitted). But while "[a]n employer's changing rationale for making an adverse employment action can be evidence of pretext, there are instances where, although the plaintiff has . . . set forth sufficient evidence to reject the defendant's

explanation, no rational factfinder could conclude that the action was discriminatory." *Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 9 (D.C. Cir. 2015) (alterations in original) (first quoting *Geleta*, 645 F.3d at 413–14; then quoting *Reeves*, 530 U.S. at 148). "This is because the plaintiff's attack on the employer's explanation must always be assessed in light of the total circumstances of the case." *Id.* (internal quotation marks omitted).

Viewing the evidence in the light most favorable to Plaintiff here, the court finds that, notwithstanding the different reasons proffered by Defendant for Hester's detail, no reasonable jury could find that the motive for the transfer decision was discriminatory or retaliatory. To begin, to the extent Defendant proffers different explanations for why it assigned Hester to the Personnel Security Branch, those differences are slight, giving rise to only a weak inference of pretext. As Defendant points out, the SCR clearly criticizes the Branch for granting security clearances not in accordance with federal regulations, which is the very reason Defendant put forth in its interrogatory responses for the detail. Moreover, the additional reason for the detail now proffered by Defendant, i.e., to address the backlog of security investigations, is rooted in undisputed record evidence. It is not cut from whole cloth for the purposes of litigation. There was a significant backlog of security clearance adjudications in the Personnel Security Branch; the SCR did criticize the Branch for that backlog; and the backlog was cited in contemporaneous e-mails as a reason for Hester's transfer. *See* Pl.'s Exs. at 85, ¶ 37. *See generally* Def.'s Exs. 9–14 at 3–14. Indeed, on the very day that Plaintiff complained to her first-line supervisor, Jose Cantu, that her workload was causing her significant stress, Oliver wrote to Cantu: "With the disaster activity and the results of the SCR, I am aware of the recent workload and stress the personnel security program is under." Def.'s Exs. 15–23 at 2. To address the problem, Oliver indicated that he would be assigning "a current DHS personnel security manager" to FEMA—who turned out to be Hester—and hiring

contractors to help with the workload. *Id.* Oliver signed off: "I believe that the combination of these two actions is an appropriate response to Harriett's concerns raised in her e-mail to you. Please pass along my concern to Harriet concerning health and the steps I am directing be taken to support her." *Id.* Oliver's words and actions undermine any reasonable inference of discrimination. Thus, while the proffered explanation in Defendant's briefing is more fulsome than that set forth in its interrogatory responses, no reasonable jury could find that the more fulsome explanation is pretext for discrimination. *Cf. Geleta*, 645 F.3d at 413 (explaining that the employer's reasons had changed over time and were thus probative of pretext where an official initially told the plaintiff to make up a reason for his reassignment, and the defendants later stated instead that the program plaintiff directed was dismantled and then again shifted to say the employer decided to create a new vision for the program).

Additional record evidence, in the form of Plaintiff's own testimony, supports the court's conclusion. Plaintiff testified that after she was investigated by DHS OIG in 2011, and refused to re-adjudicate a case, "the chain of events just started happening," and her "duties were taken away," "*because* they wanted [her] to . . . re-adjudicate a case, and [she] refused to do it." Notice of Correction at 4. Thus, Plaintiff admits that her own conduct set in motion the course of events leading to Hester's designation to the Branch.

Finally, and perhaps most critically, the person Plaintiff claims effectively replaced her, Hester, is herself an African-American female. *See* Def.'s Stmt. ¶ 66; Pl.'s Stmt., Def. Fact ¶ 66. This fact "cuts strongly against any inference of discrimination." *Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005). Thus, the court finds that no reasonable jury could conclude that the real reason for the September detail was race, color, or gender discrimination or retaliation.

Accordingly, the court grants Defendant's Summary Judgment Motion with respect to Plaintiff's Title VII discrimination and retaliation claims based on the September detail.

## C.    November Removal and Reassignment

Finally, the court turns to Defendant's decision to remove Plaintiff from her position as Chief of the Personnel Security Branch and to reassign her as head of the Training Section. For the reasons stated below, the court not only finds that *Egan* is inapplicable to Plaintiff's Title VII claims based on the reassignment, but also holds that there is sufficient evidence upon which a reasonable jury could conclude that the reassignment was adverse and that Defendant's proffered reasons for that decision were pretext for discrimination and retaliation.

### 1.    *Justiciability of Plaintiff's Title VII Claims Under* Egan

The question whether *Egan* bars judicial review of Plaintiff's Title VII claims predicated on her reassignment turns on whether Defendant's proffered explanation for that action involves a predictive judgment about security risk. It does not.

As with the September detail, Defendant has proffered different reasons for its November reassignment decision. In its interrogatory responses, for example, Defendant states that Salazar made the decision to reassign Plaintiff due to concerns about the improper adjudication of security clearances. *See* Pl.'s Exs. at 23.[7] Now in its Motion, Defendant claims that a series of other individuals participated in the decision both to remove Plaintiff as Chief of the Branch and to reassign her to a different position, citing broad reasons relating to the SCR as the basis for its

---

[7] Defendant cites to a contemporaneous e-mail showing a continued concern relating to security clearances within the Branch, *see* Def.'s Mem. at 15, but that e-mail is hardly conclusive that Plaintiff's security clearance decisions motivated Defendant to reassign her, *compare* Def.'s Exs. 24–30 at 6 ("The first recommendation is that until they revamp the Personnel Security Branch, we need to take over the FEMA OCSO cases and I am quite concerned about all of their national security adjudications especially at the TS/SCI level."), *with id.* at 6–7 ("Secondly, our efforts to assist are moving at a slow pace. Harriett is still the driving force within the organization and we are constantly hitting road blocks. So my recommendation is to move Harriett to another security discipline within the office. Harriett tried to halt the training efforts and is still the authority on PSB actions.").

decision—namely, that Plaintiff failed to accept the results of the SCR and impeded Defendant's efforts to address the shortcomings identified therein. *See, e.g.*, Def.'s Mem. at 3, 9, 30; *cf.* Def.'s Stmt., ¶¶ 89–90. It ought to be plain by now that *Egan* does not necessarily preclude review of such reasons for an employment decision. *See Rattigan*, 689 F.3d at 770 (noting that "it is our duty not only to follow *Egan*, but also to preserv[e] to the maximum extent possible Title VII's important protections against workplace discrimination and retaliation" (alteration in original) (internal quotation marks omitted)). Because a reasonable trier of fact could conclude that security-clearance concerns had little, or nothing at all, to do with the decision to reassign Plaintiff, the court cannot conclude at this stage as a matter of law that Plaintiff's discrimination claims premised on the November reassignment are non-justiciable.

### 2. *Adverse Employment Action*

Next, Defendant argues that the November reassignment does not constitute a material adverse action. Defendant points out that Plaintiff retained her GS-14 level and her title as "Chief." Def.'s Mem. at 22. It also asserts that the transfer did not result in a reduction of Plaintiff's responsibilities. In support, Defendant points to Salazar's "Memorandum of Record," which it claims Plaintiff refused to accept, stating that "Plaintiff would serve as the 'primary supervisor' over an expansive security education and training program portfolio." *Id.* (citing Def.'s Exs. 24–30 at 14–16); *see* Def.'s Stmt. ¶¶ 103–04. Defendant also points to Salazar's Declaration, Def.'s Mem. at 22, which describes the duties of Plaintiff's Training Section position as follows:

> [T]he duties [of Plaintiff's job series] involved the management, supervision, and performance of work in: (1) developing, evaluating, maintaining, and/or operating systems, policies, training, devices, procedures, and methods used for safeguarding information, property, personnel, operations, and materials; and/or (2) developing and implementing policies and procedures for analyzing and evaluating the character, background, and history of employees, candidates for employment, and other persons having or

> proposed to be granted access to classified or other sensitive information, materials, or work sites.

Def.'s Exs. 24–30 at 3, ¶ 7. According to Defendant, this description shows Salazar "envisioned Plaintiff performing functions" of equal significance. *See* Def.'s Mem. at 22–23.

Plaintiff, on the other hand, argues that her reassignment was materially adverse because her new position as Chief of the Training Section involved significantly different responsibilities, and her supervisory duties were eliminated or at least reduced. *See* Pl.'s Opp'n at 17. In particular, Plaintiff contends that when she was reassigned to head the Training Section there was not "any training section in existence, in the sense of a unit with employees." Pl.'s Stmt., Pl. Fact ¶ 103. She further claims that at the time, "there was not even a position description for the chief's job," *id.*, and that she was not provided with such a description until long after her meeting with Salazar in November 2011, *id.* ¶ 90; *see also* Pl.'s Exs. 91–92, ¶ 89 ("[Salazar] stated [a position description] was forthcoming, however I did not receive a new Standard Form action until February . . . ."); *id.* at 181–82 (Salazar deposition). In this vein, Plaintiff also disputes that she refused to allow Salazar to issue her the "Memorandum of Record." *See* Pl.'s Stmt., Def. Fact ¶ 89, Pl. Fact ¶ 90. Moreover, as to the position description itself, Plaintiff notes that there was nothing in the description (or Salazar's declaration) indicating that she would supervise anyone. *See* Pl.'s Stmt., Pl. Fact ¶ 105. Finally, Plaintiff claims that, even if she retained some supervisory authority, the position of Chief of the Training Section was a "substantially different job," *see* Pl.'s Opp'n at 17, and that she had no experience in training staff or managing a training program, *see* Pl.'s Exs. at 91, ¶ 87–88.

As discussed above, a lateral transfer can constitute a materially adverse action where the transfer involves the withdrawal of supervisory duties or reassignment with significantly different responsibilities. *See Czekalski*, 475 F.3d at 364–65. In this case, Plaintiff has raised genuine

factual disputes with respect to whether she lost supervisory duties and whether her position involved significantly different responsibilities. First, the parties disagree as to whether the training position was *in fact* a position with existing duties at the time of her reassignment.[8] *See* Pl.'s Exs. at 92, ¶ 90 ("As far as I could tell from what management told me, the training position would have few or no staff to supervise."). This factual dispute is material because if the Training Section was not staffed, then Defendant's contention that Plaintiff would be the "primary supervisor" of the Section is irrelevant.

In addition, the parties disagree about whether the duties of the new position were substantially different than those Plaintiff performed as Chief of the Personnel Security Branch. *Compare id.* at 86, ¶¶ 42–48 (describing some of Plaintiff's duties as Chief of Personnel Security Branch), *with* Def.'s Exs. 24–30 at 14–16 (Memorandum of Record). Plaintiff claims that she had no experience in training staff or managing a training program, *see* Pl.'s Exs. at 91, ¶¶ 87–88, and her new position, as described by Salazar, clearly implicated such duties, *see* Def.'s Exs. 24–30 at 14–16, ¶ 7. Indeed, the title of the position was "Chief of the Training Section." Defendant fails to address why the shift in the *nature* of the job responsibilities between the two pertinent positions—Chief of the Personnel Security Branch and Chief of the Training Section—was insignificant. *Cf.* Def.'s Exs. 24–30 at 4, ¶ 7 (explaining why Salazar believed Plaintiff was qualified for the position based on her *previous* experience as a Federal Special Security Officer); *id.* ¶ 8 (stating that the work was "just as significant," without any further comparison of the two

---

[8] In the Memorandum of Record, Salazar described this position as "new." *See* Def.'s Exs. 24–30 at 14; *see also id.* at 26 (formal reassignment memorandum issued by Cantu describing position as "new"). In his declaration, Salazar explains that he considered the position "new" because "although [it] had been in existence prior to [the] reassign[ment] . . . a reorganization of the OCSO in November 2011 resulted in a shift in the focus of the Training Section." *See* Def.'s Exs. 24–30 at 3, ¶ 6. This tells this court little, however, about the nature of the Training Section at the time of Plaintiff's reassignment or whether it was in fact staffed. Plaintiff, for example, claims in her declaration that, at the time of her reassignment, "the training needs of the office had not been identified" and thus "it was impossible to know what the actual duties of the position would be." Pl.'s Exs. at 92, ¶ 90.

positions' duties). This fact is material, as a significant change in responsibilities factors into the adversity determination. *See Niskey*, 859 F.3d at 9 (citing *Forkkio*, 306 F.3d at 1131); *cf. Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (holding that where a plaintiff alleges a claim based on reassignment, "the fact-finder must compare the position the plaintiff held before the transfer to the one he holds afterwards," and comparing the two position descriptions at issue).

Therefore, viewing the evidence in the light most favorable to Plaintiff, the court concludes that a reasonable juror could find that Plaintiff suffered an adverse action when she was reassigned. *See Czekalski*, 475 F.3d at 365 ("The court may not take that question away from the jury if a reasonable juror could find that the reassignment left the plaintiff with significantly diminished responsibilities.").

### 3. *Pretext*

Having concluded that the evidence is sufficient to show that Plaintiff suffered a materially adverse action, the court now turns to evidence of discriminatory and retaliatory intent. As with the September detail, Plaintiff relies on Defendant's inconsistent statements about the employment action taken to demonstrate pretext. *See Wheeler*, 812 F.3d at 1115, 1119. Unlike the September detail, however, the court finds that the inconsistencies in Defendant's reasons for Plaintiff's reassignment are far more pronounced and create a sufficient dispute of fact for the jury's consideration.

Defendant's explanations for Plaintiff's reassignment have been a moving target. According to Plaintiff, when Salazar and Cantu informed her about the reassignment, they said that the decision was made "to improve efficiencies of the office." Pl.'s Exs. at 91, ¶ 89. They also demurred when Plaintiff asked if she had done something wrong—apparently, they never raised the issue of erroneous security clearances—and further told her that the training branch

would be a "good fit." *Id.* A contemporaneous e-mail, however, suggests a different reason for the reassignment. On November 1, 2011, Kimberly Lew, DHS OCSO's Chief of Personnel Security Division, e-mailed Gregory Marshall, DHS's Chief Security Officer, to offer her observations and recommendations for improving the Personnel Security Branch. *See* Def.'s Exs. 24–30 at 6–7. Lew did not mention "efficiencies." Instead, she wrote:

> [O]ur efforts to assist are moving at a slow pace. Harriett is still the driving force within the organization and we are constantly hitting road blocks. So my recommendation is to move Harriett to another security discipline within the office. Harriett tried to halt the training efforts and is still the authority on PSB actions.

*Id.* A trier of fact will have to decide whether improving "efficiencies" is simply a euphemism for "halting training efforts," or evidence of an unlawful motive.

Defendant's shifting explanations for the reassignment during the EEO investigation and in this litigation only buttress the case for pretext. According to the Final Agency Decision, prepared at the conclusion of the internal EEO investigation: "Management articulated legitimate, non-discriminatory reasons for reassigning [Plaintiff] to the Training Branch. The [Program Protection Division Director] stated that he reassigned [Plaintiff] . . . 'to improve efficiencies and effectiveness within [the Division] and to allow [Plaintiff] an opportunity to use [her] security skills within another unit of the OCSO.'" FAD at 8. Once in litigation, that explanation faded away. Instead, Defendant's supplemental interrogatory response focused exclusively, and quite dramatically, on the concern that Plaintiff and the Personnel Security Branch had improperly granted security clearances that created an "undue risk to national security." Pl.'s Exs. at 23. The interrogatory response said nothing about efficiencies, interfering with training efforts, or putting Plaintiff's skills to another use. Then, for purposes of summary judgment, the explanation shifted yet again. Defendant's newly proffered reason was "to utilize [Plaintiff's] skill set and, more

importantly, to remove an impediment to the efforts to address 'observations' identified in the SCR." Def.'s Mem. at 30–31. Each of the agency's declarants, including Salazar and Cantu, echoes this rationale. *See* Def.'s Exs. at 24–30 at 3, ¶ 6 (Salazar Declaration) ("I recommended to Mr. Oliver that Ms. Ames be reassigned . . . because of her unwillingness to cooperate in implementing the mitigation plan under the SCR, among other reasons."); Def.'s Exs. 15–23 at 20, ¶ 13 (Lew Declaration) ("I also recommended that Ms. Ames be reassigned . . . because she was impeding our efforts to address the issues in the SCR, including halting training efforts."); *id*. at 8, ¶ 8 (Cantu Declaration) ("Based on the findings within the [SCR] . . . as well as my personal observations that Ms. Ames was impeding our efforts to deal with the issues in the SCR, I made the decision to recommend that Ms. Ames be assigned . . . ."); *see also* Def.'s Exs. 9–14 at 18, ¶ 11 (Marshall Declaration); Def.'s Exs. 1–5 at 5, ¶ 18 (Oliver Declaration). Not one of them attributes Plaintiff's reassignment, even in part, to her improper granting of security clearances that created an "undue risk to national security." It may be, as Defendant contends, that the common thread running through these explanations is Plaintiff's impeding implementation of the SCR's recommendations. But that conclusion is better reached by the jury, not this court at the summary judgment stage.

Finally, record inconsistencies concerning who made the decision to reassign Plaintiff support her case for pretext. For example, in his EEO investigation affidavit, Cantu denied any participation in the reassignment decision. Pl.'s Stmt., Pl. Fact ¶ 87; Def.'s Reply Stmt. at 1. Yet the record contains a memorandum issued by Cantu to Plaintiff dated November 21, 2011, which states, "I have made the decision to reassign you . . . .," Def.'s Exs. 24–30 at 26, as well as evidence that Cantu told Oliver that he had decided to reassign Plaintiff, *see* Def.'s Exs. 1–5 at 6, ¶ 20 (Oliver declaration stating, "[s]hortly after taking to him, Mr. Cantu emailed me and told me that

he made the decision to recommend reassignment of Ms. Ames"); Def.'s Exs. 24–30 at 22 (e-mail from Cantu to Oliver, stating Cantu had "made the decision to recommend reassignment" of Plaintiff and requesting favorable consideration of that decision); *cf. id.* at 23 (e-mail from Cantu to Lew advising her that Plaintiff had been informed of her reassignment on the previous day and stating that he would like to introduce Nina Kirby as the acting Branch Chief). Defendant's Amended Answer attempts to clarify that Cantu did not make the decision but simply signed a letter from upper management, *see* Am. Answer ¶ 48, and in its Motion Defendant continues to maintain that Cantu was not a decision maker, *see* Def.'s Reply at 20. This may well be true. But a jury will have to decide whether Defendant's changing positions are merely innocent or proof of discriminatory motive.[9]

With respect to Plaintiff's retaliation claim, the court finds that Plaintiff can proceed to trial. For the reasons already discussed, there is a genuine dispute of material fact as to whether the agency's reason for the reassignment was pretext. Moreover, the record facts are sufficient to support a reasonable inference of causation. Plaintiff initiated contact with the EEO Counselor in August 2011 and filed a formal Complaint in October 2011. *See* FAD at 2. The November reassignment occurred roughly two months later, on November 21, 2011. That temporal proximity is close enough to put the issue of causation to a jury. *See Hamilton*, 666 F.3d at 1357–58.

Thus, Defendant's Motion for Summary Judgment is denied with respect to Plaintiff's discrimination and retaliation claims premised on her reassignment.

---

[9] Although a closer call, Plaintiff's gender discrimination claim likewise may proceed to trial. Ordinarily, "a replacement within the same protected class cuts strongly against any inference of discrimination." *Murray*, 406 F.3d at 715. Here, Plaintiff's *temporary* replacement was a woman, Nina Kirby. The record does not, however, contain evidence as to the identity of Plaintiff's *permanent* replacement. Therefore, the strong inference against discrimination that applies when a replacement is of the same protected class does not necessarily apply here. A jury will have to decide what, if any, weight to give to the fact that Plaintiff was temporarily replaced by a woman.

### D.       Plaintiff's Request to Reopen Discovery under Rule 56(d).

In her Opposition, Plaintiff alternatively asks the court to deny Defendant's Motion under Federal Rule of Civil Procedure 56(d). Plaintiff claims that Defendant's answers to Plaintiff's interrogatories concerning the personnel who participated in the agency decision-making and the reasons for the three aforementioned decisions "were radically different from the information provided in support of the summary judgment motion," and that such differences effectively barred her "from follow-up written discovery and from taking the depositions of the officials whose affidavits the agency would ultimately rely on." Pl.'s Opp'n at 32. While she acknowledges that the "natural remedy" for such conduct would be to defer ruling on Defendant's Motion so that Plaintiff could take additional discovery, Plaintiff ultimately asks the court to deny the Motion in order to avoid rewarding Defendant for its conduct and further delaying resolution of the case. *See id*. Moreover, because she did not submit an affidavit or declaration along with her Opposition, as required by Rule 56(d), Plaintiff also moves for leave to file a one-sentence declaration of counsel, which simply says that the statements made by counsel regarding the Rule 56(d) request in Plaintiff's Opposition "are true." *See* Request for Leave to File Decl. of Counsel, ECF No. 79 [hereinafter Request for Leave], at 3.[10] For the following reasons, the court denies this request.

Under Rule 56(d), if the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). A Rule 56(d) motion "requesting time for additional discovery should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Convertino v. U.S. Dep't*

---

[10] Citations to Plaintiff's Request for Leave are to the page numbers electronically generated by CM/ECF.

*of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012) (internal quotation marks omitted). But merely invoking Rule 56(d) is not enough to defeat summary judgment. The party seeking relief under Rule 56(d) must submit a declaration stating with "sufficient particularity" why additional discovery is necessary. *Id.* (internal quotation marks omitted). To do so, the declaration must satisfy three criteria. *Id.* "First, it must outline the particular facts [s]he intends to discover and describe why those facts are necessary to the litigation." *Id.* "Second, it must explain 'why [she] could not produce [the facts] in opposition to the motion [for summary judgment].'" *Id.* at 99–100 (second and third alterations in original) (quoting *Carpenter v. Fed. Nat'l Mortg. Ass'n*, 174 F.3d 231, 237 (D.C. Cir. 1999)). "Third, it must show the information is in fact discoverable." *Id.* at 100. Furthermore, while the court may consider the diligence of the party requesting relief, diligence alone is insufficient to satisfy Rule 56(d). *See U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26–27 (D.C. Cir. 2014) (emphasizing that district courts "should resolve each request based on its application of the *Convertino* criteria to the specific facts and circumstances presented in the request").

Here, Plaintiff's Rule 56(d) request falters at the first criteria. The only remaining claim as to which additional discovery might be relevant is the September detail of Hester. As to that claim, however, the court's analysis accounted for the discrepancy in Defendant's reasons for that decision, yet the court decided based on the totality of the record that Plaintiff had come up short in demonstrating a genuine dispute of fact as to pretext. Thus, it is far from clear how additional discovery might alter the court's conclusion. Moreover, counsel's declaration does not state with "sufficient particularity" the facts he intends to discover. *See Messina v. Krakower*, 439 F.3d 755, 762–63 (D.C. Cir. 2006). The declaration merely refers back to Plaintiff's opposition brief, which states that the new reasons offered in the summary judgment declarations "bar[red] Ms. Ames

from follow-up written discovery and from taking depositions of the officials whose affidavits the agency would ultimately rely on." Pl.'s Opp'n at 32; *see* Request for Leave at 3. That statement, however, is entirely conclusory and tells the court little about the facts Plaintiff proposes to discover. Accordingly, the court denies Plaintiff's request for relief under Rule 56(d).

## V.     CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendant's Motion for Summary Judgment, and denies Plaintiff's Request for Leave to File Declaration of Counsel.


Dated: December 27, 2017                          Amit P. Mehta
                                                  United States District Judge